IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                           No. Crim. 16-455 MCA/SCY

JESUS BARRAZA-ROCHA, and
ARACELI LOPEZ-LOPEZ,

      Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION OF DEFENDANTS'
JOINT MOTION TO SUPPRESS EVIDENCE (ECF NO. 33)**

Defendants in this case jointly seek to suppress evidence of methamphetamine seized from the vehicle in which they rode on January 12, 2016. ECF No. 33. Defendants argue that this seizure was the product of an unconstitutionally excessive detention and their involuntary consent to search. On April 25, 2016, the Court referred this matter to me to conduct hearings and recommend an ultimate disposition. ECF No. 38. After having considered the parties' briefs and arguments as well as evidence provided during a hearing on this matter, I conclude that reasonable suspicion supported the challenged detentions and that Defendants voluntarily consented to the search of the vehicle. As a result, I recommend that the Court deny Defendants' joint motion to suppress.

I. FACTUAL FINDINGS

Because law enforcement recorded the encounter with Defendants through a dashboard camera and an audio recorder, the facts underlying Defendants' motion are largely undisputed. Defendants acknowledge that at about 8:21 a.m. on January 12, 2016, New Mexico State Police ("NMSP") Officer Joshua Campos stopped a car driven by Defendant Jesus Barraza-Rocha for

1

following too closely. Hearing Tr. at 6.[1] Defendants do not contest that this stop was legal and based on probable cause.  Hearing Tr. at 30.  Although Defendant Barraza-Rocha was driving the vehicle at the time of the stop, one of the passengers, Defendant Araceli Lopez-Lopez, owned the car.  Hearing Tr. at 21; ECF No. 22 at 2. Also in the car was a third adult occupant and Defendant Lopez-Lopez's two children. Hearing Tr. at 16.

After stopping the vehicle, Officer Campos approached it from the passenger side and asked Defendant Barraza-Rocha for his driver's license, vehicle registration, and proof of insurance.  ECF No. 33 at 3. Defendant Barraza-Rocha provided the registration and an identification card from the Republic of Mexico, but did not provide a valid driver's license or proof of insurance. Id. Officer Campos then asked Defendant Barraza-Rocha to step out of the vehicle and meet him in front of his patrol car. Hearing Tr. at 9.  Because the outside temperature was below freezing, Officer Campos advised Defendant Barraza-Rocha to put on his jacket. ECF No. 33 at 3.  Defendant Barraza-Rocha and Officer Campos then walked to Officer Campos's car (Hearing Tr. at 9) where they are no longer captured on video.  While Defendant Barraza-Rocha was standing beside Officer Campos's car, Officer Campos completed a "wants and warrants" check on Defendant Barraza-Rocha and discovered that although Defendant Barraza-Rocha did not have a valid driver's license, he did not have any active warrants. Hearing Tr. at 9; ECF No. 33 at 4.

Officer Campos began to write out a traffic citation for following too closely and, in the process, began to ask Defendant Barraza-Rocha questions about his travel plans. Hearing Tr. at 10.  He also noted that Defendant Barraza-Rocha's eyes were red and so he performed a test to

---

[1]  I cite to the transcript of the July 25, 2016 hearing as "Hearing Tr." and the audio and video recording of Officer Campos's stop of Defendants as "Video".  I will use elapsed time to cite to portions of the video, which was admitted into evidence at the July 25, 2016 suppression hearing. Where facts are undisputed, I will also occasionally cite to Defendants' opening  brief, ECF No. 33.

determine if there were any signs of horizontal gaze nystagmus. ECF No. 33 at 4. Not seeing any sign that Defendant Barraza-Rocha was intoxicated, Officer Campos resumed questioning Defendant Barraza-Rocha about his travel plans and the people in the car with him. Id. at 4-5. Defendant Barraza-Rocha informed Officer Campos that the car belonged to his girlfriend. Video at 9:38. Officer Campos asked Defendant Barraza-Rocha to provide his girlfriend's name. Video at 10:05. Up to this point, the conversation between Defendant Barraza-Rocha and Officer Campos was partly in English and partly in Spanish, with Officer Campos speaking broken Spanish and Defendant Barraza-Rocha speaking broken English. Video at 2:15 to 10:05. Nonetheless, it appears that Defendant Barraza-Rocha was able to understand Officer Campos and provide answers that were responsive to Officer Campos's questions.

Officer Aguirre then arrived on the scene and assisted with translation.[2] Video at 10:10. Officer Aguirre asked Defendant Barraza-Rocha in Spanish to provide his girlfriend's last name but Defendant Barraza-Rocha was unable to do so. Video at 10:15. The next two minutes of the video consist of mostly silence, with the exception being a short discussion between Office Aguirre and Officer Campos in which Officer Campos asks Office Aguirre if he "should check him again." Video at 10:30 to 12:20. Officer Campos then informed Defendant Barraza-Rocha that they are going to check the VIN on the car. Video at 12:20.[3]

Officer Campos next walked to Defendant Lopez-Lopez's car, knocked on the passenger side window, and informed Defendant Lopez-Lopez that he is going to check the VIN. Video at 12:50. He compared the VIN plate on the dashboard to the VIN on the registration (which takes approximately five seconds), and then opened the driver's door of the Ford to check the VIN located on either the side of the door or the doorjamb ("Nader sticker"). Video at 12:50 to 14:05;

---

[2] Defendants have not challenged Officer Aguirre's testimony that his Spanish is "good". Hearing Tr. at 73.
[3] "VIN" is an acronym for "vehicle identification number."

Hearing Tr. at 13-14, 41-43. In addition to checking the Nader sticker, Officer Campos engaged

Defendant Lopez-Lopez in conversation about her travel plans, how long she had owned the car,

who she was traveling with, and the name of her boyfriend.  Video at 13:10 to 14:05.

Approximately fifty-five seconds elapsed from the time Officer Campos opened the car door to

check the Nader sticker until the time he shut the door. *Id*.

Officer Campos thereafter returned to where Defendant Barraza-Rocha was standing,

tells him "let me explain this to you and I'll get you out of here, okay." Officer Campos

explained the citation to him, returned his documents, told him to be careful getting back on the

road, informed him that he was free to leave, let him know that he could drive away even though

he does not have a valid driver's license, and allowed him to walk back to the car he was driving.

Video at 14:10; Hearing Tr. at 17.  Just before Defendant Barraza-Rocha reached the rear of the

vehicle, Officer Campos called out and asked if he could ask Defendant Barraza-Rocha some

questions. Video at 16:30.  Defendant Barraza-Rocha then walked back to the patrol car to talk to

Officer Campos. Video at 16:35.

During Officer Campos's encounter with Defendant Barraza-Rocha, Defendant Barraza-

Rocha told Officer Campos that they were driving to Denver to visit a cousin named Alberto.

Video at 17:10 to 18:00.  He further advised that, even though the group planned on staying with

his cousin, that he did not know his cousin's address or telephone number.  Video at 17:50 to

19:00.  He explained that he communicates with his cousin through Facebook and that his cousin

was going to meet him next to the freeway and that they would then follow his cousin to his

house.  Video at 17:50 to 19:00.  Officer Campos then asked Defendant Barraza-Rocha a few

more questions about his trip, where he and Defendant Lopez-Lopez work, what his girlfriend's

last name is, how long they have been dating, whether he is married, whether he has kids, and the

ages of his children. Video at 19:00 to 21:00.  Next, Officer Campos directed Officer Aguirre to tell Defendant Barraza-Rocha to "hang out right here" and Officer Aguirre relayed this instruction to Defendant Barraza-Rocha. Video at 21:00.

Officer Campos returned to Defendant Lopez-Lopez's vehicle, knocked on the passenger window again, and began to ask her many of the same questions he just asked Defendant Barraza-Rocha.  Video at 21:10 to 24:20.  Instead of saying that they would be staying with Defendant Barraza-Rocha's cousin named Alberto, Defendant Lopez-Lopez advised that they were going to meet a friend of hers from Mexico named Sergio.  Video at 21:45 to 24:20. Instead of confirming that they would be staying at a relative's house, she told Officer Campos that they were planning on staying at a hotel.  She further advised that, even though she had been dating Defendant Barraza-Rocha for six months, she did not know where he was employed.  *Id.* Officer Campos then asked the third occupant, who he had asked to step outside and who Defendant Barraza-Rocha identified as his brother, many of the same questions about their travel plans and the work that he does.  Video at 24:20 to 26:50.  After he finished, Officer Campos directed this third passenger to remain outside by the front of Defendant Lopez-Lopez's vehicle. Video at 26:55.

Officer Campos then walked back to Defendant Barraza-Rocha where he asked about what luggage Defendant Barraza-Rocha had in the car and whether he had any various illegal items in the car.  Video at 27:10 to 28:30.  Officer Campos next asked Officer Aguirre to ask Defendant Barraza-Rochain Spanish whether Defendant Barraza-Rocha would consent to a search of the vehicle. Video at 28:35.  Defendant Barraza-Rocha provided consent and Officer Campos provided him a New Mexico implied consent form written in Spanish. Video 28:40 to 29:05.  A period of time passed while Defendant Barraza-Rocha read the form. Defendant

Barraza-Rocha then asked what would happen if the officers damaged the car during the search. Video at 29:55.  Officer Aguirre explained to him in Spanish that they would not break anything. Video at 30:30.   Officer Campos told Defendant Barraza-Rocha to "hang out right here" and returned to Defendant Lopez-Lopez's vehicle.[4] Video at 30:55.

Officer Campos opened the passenger door where Defendant Lopez-Lopez was sitting and asked her about luggage and whether there was any contraband in the car.  Video at 31:00 to 32:00.  Officer Campos then asked Defendant Lopez-Lopez if he could search her vehicle. Video at 32:00.  While the video does not show Defendant Lopez-Lopez and the audio does not clearly capture Defendant Lopez-Lopez's response, I credit Officer Campos's testimony that Defendant Lopez-Lopez responded in the affirmative.  Hearing Tr. at 20-21.  To be sure Defendant Lopez-Lopez was consenting, Officer Campos then again asked, "I can search it?" and Defendant Lopez-Lopez re-affirmed that she was providing consent to search. Video at 32:00. Next, Officer Campos asked Defendant Lopez-Lopez if she preferred to read English or Spanish and when Defendant Lopez-Lopez replied "Spanish" Officer Campos pointed out to her the Spanish portion of the implied consent to search form.[5] Video at 32:05 to 32:15.  He then asked her to read the form and "if everything is still okay" to initial the form in one place and sign it in another. Video at 32:20 to 32:30. Officer Campos encouraged Defendant Lopez-Lopez to let him know if she had any questions. *Id*.  About thirty seconds passed before Defendant Lopez-Lopez indicated that she had read the form.  Video at 33:00.  Once Defendant Lopez-Lopez was done

---

[4] Officer Aguirre testified that Defendant Barraza-Rocha became increasingly nervous throughout the encounter.  Hearing Tr. at 17, 69.  However, he largely based this perception on increasing shaking and his observation that Defendant Barraza-Rocha was "fidgety" and "wouldn't stand still." *Id*.  Given that Defendant Barraza-Rocha was standing outside in below freezing temperatures, I decline to attribute Defendant Barraza-Rocha's shaking and not standing still to nervousness.

[5] Officer Campos testified that Defendant Lopez-Lopez stated that she preferred to read the form in English. Hearing Tr. at 21.  While difficult to hear, it appears that when asked whether she preferred to read the form in Spanish or English, Defendant Lopez-Lopez responded "Spanish". Video at 32:10.

reading the form, Officer Campos again asked her if she had any questions and, when she responded in the negative, he again showed her where to initial and sign the form.  Video at 33:00 to 33:10.  Officer Campos next told Defendant Lopez-Lopez that he was soon going to have her step out of the car and gave her the option of waiting by the side of the road or waiting in his car where it would be warmer. Video at 33:15.

Soon thereafter, while outside and away from Defendant Lopez-Lopez, Officer Campos quietly advised Officer Aguirre that he was going to tell Defendant Lopez-Lopez that he knows that she has two kids and this is her chance to help herself out.  Video at 33:15 to 35:30. Officer Campos then returned to Defendant Lopez-Lopez, told her she needed to think about her kids and that she needed to be honest with him. Video at 36:30 to 37:00.  He noted that if there was something she was not part of and there was some type of contraband in the vehicle that he did not want her to be separated from her kids. *Id*.  Thus, he told her, this was her time to help herself and him because if he searches the car, finds something, and she was not honest with him, then "we are going to go from there, so." Video at 36:30 to 37:00.  Defendant Lopez-Lopez reaffirmed that there was nothing in her vehicle.  Video at 37:00.  Officer Campos then had Defendant Lopez-Lopez and her kids exit the vehicle. 37:00 to 37:30.  Defendant Lopez-Lopez elected to wait outside rather than in Officer Campos's car.  37:30 to 38:00.

Officer Aguirre and Officer Campos began to search the vehicle.  During the search, police eventually discovered methamphetamine hidden within the engine block.[6] Hearing Tr. at 53.

---

[6] Although at some point at least one other officer arrives to help conduct the search, this occurs after Defendants have provided consent for the search. Video at 39:50.

II.  <u>ANALYSIS</u>

Defendants argue that, in opening the driver's side door and checking the VIN on the Nader sticker located either on the door or the doorjamb of the car, Officer Campos violated their Fourth Amendment rights.  Defendants' argument implicates two separate Fourth Amendment concerns: (1) whether opening the car door to look at the Nader sticker unlawfully invaded a space in which Defendants maintained a reasonable expectation of privacy and (2) whether checking the VIN sticker unlawfully delayed the detention.  With regard to the first issue, I recommend concluding that Officer Campos's act of opening the car door to check the Nader sticker did not violate the Fourth Amendment.  Even if opening the car door violated the Fourth Amendment, however, any evidence thereafter obtained is too attenuated from the act to merit suppression.  With regard to whether checking the VIN constituted an illegal detention, I conclude that Officer Campos's questioning of Defendant Lopez-Lopez lasted longer than reasonably necessary to check the Nader sticker.  However, because statements Officer Campos lawfully obtained from Defendant Barraza-Rocha provided reasonable suspicion to justify the brief extended detention, I recommend finding that the duration of Officer Campos's encounter with Defendant Lopez-Lopez while checking the Nader sticker did not violate the Fourth Amendment.  Further, I find later detention and questioning to be supported by reasonable suspicion.  Finally, I conclude that both Defendants voluntarily consented to the search of the vehicle in which they were riding.  Thus, I recommend denying Defendants' motion to suppress.

<u>A. Officer Campos did not violate the Fourth Amendment by opening the car door to check the Nader sticker</u>

Defendants do not argue that Officer Campos violated the Fourth Amendment by checking the VIN located on the vehicle's dashboard and comparing it to the vehicle's registration.  Instead, they argue that once Officer Campos determined that the VIN plate on the

dashboard had not been tampered with and that it matched the VIN on the registration, Officer

Campos was forbidden from also opening the car door to check the Nader sticker.  Analysis of

this issue begins with the Supreme Court's decision in *New York v. Class*, 475 U.S. 106 (1986).

In *Class*, after lawfully stopping a motorist, a police officer opened the door of the car to

look for a VIN he thought would be located on the left doorjamb.  *Class*, 475 U.S. at 108.  When

he did not find the VIN on the doorjamb, he reached into the interior of the car to move some

papers and found the VIN plate on the dashboard of the vehicle.  *Id*.  In so doing, he saw a gun

and arrested the defendant for illegal possession of the gun.  *Id*.  The defendant sought to

suppress evidence of the gun, arguing that the police officer violated the Fourth Amendment

when he reached into the vehicle and saw the gun.  *Id*.  While the Supreme Court determined that

reaching into the vehicle constituted a search, it "was sufficiently unintrusive to be

constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN

and the fact that the officers observed respondent commit two traffic violations."  *Id*. at 119.

Notable for purposes of the present case, the Court gave no indication that the officer's

act of opening the door to look for the VIN on the doorjamb posed a constitutional concern.  To

the contrary, the Court noted "the VIN plays an important part in the pervasive regulation by the

government of the automobile. A motorist must surely expect that such regulation will on

occasion require the State to determine the VIN of his or her vehicle, and the individual's

reasonable expectation of privacy in the VIN is thereby diminished. This is especially true in the

case of a driver who has committed a traffic violation."  *Id.* at 113.  The Court then continued

that "because of the important role played by the VIN in the pervasive governmental regulation

of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in

plain view, we hold that there was no reasonable expectation of privacy in the VIN."  *Id.* at 114.

The Court noted, however, that this holding "does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile. If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it." *Id*. at 119.

Although the Supreme Court did not appear troubled by the officer's act of opening the car door to look for the VIN on the doorjamb, the Tenth Circuit later indicated that, if the officer has already checked the VIN on the dashboard, opening a door to check the Nader sticker violates the Fourth Amendment.  In *United States v. Caro*, a police officer lawfully stopped a vehicle and became suspicious when a registration check revealed that the car was registered as being a color other than its actual color.  *United States v. Caro*, 248 F.3d 1240, 1242 (10th Cir. 2001).  By looking through the windshield, the police officer then compared the VIN on the vehicle registration to the VIN plate on the dashboard that was visible through the car's windshield. *Id*.  The officer determined that the numbers matched.  *Id*.  Nonetheless, the officer removed the driver from the car and looked for the VIN on the driver's door. *Id*. at 1242-43. Although the officer did not locate a VIN on the door, he noticed several air fresheners which made him suspicious that the car might be transporting controlled substances.  *Id*. at 1243.  The Tenth Circuit determined that the officer's act of opening the car door to check the Nader sticker constituted an unlawful entry into the vehicle and, because what he saw when he opened the door contributed to his suspicions, the court suppressed the illegal drugs eventually found in the vehicle. Specifically, the Tenth Circuit held that "where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer

to extend the scope of a detention *by entering* a vehicle's passenger compartment for the purpose of further examining any VIN." *Id*. at 1246 (emphasis added).

The question arises as to whether use of the word "entering" in *Caro* refers to physically entering a vehicle, as occurred in *Class* when the officer reached into the car and moved some papers on the dashboard, or simply refers to opening the car door to gain access to the interior portion of the car where the Nader sticker is located (the door jamb or the side of the door). For a number of reasons, it appears *Caro* meant "entering" to refer to the latter rather than the former.

First, and most importantly, the facts set forth in *Caro* do not indicate that the officer ever actually entered the car. To the contrary, the facts indicate that the officer merely opened the door of the vehicle to check the Nader sticker. *Id*. at 1243. Looking at the side of an open door is much more easily done from outside a car than from within a car. Thus, it does not appear that the officer in *Caro* ever physically entered the car. Therefore, application of the word "entering" to the facts of the case indicate that the Tenth Circuit in *Caro* viewed opening the car door to gain access to an interior portion of the car as "entering" the car even if the officer did not put any portion of his body within the frame of the car.

Second, in rejecting the government's argument that *Class* allows an officer to open a car door to check a VIN on the interior of the door, *Caro* focused on the Supreme Court's limitation that its holding "does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile. If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it." *Id*. at 1245 (quoting *Class*, 475 U.S. at 119). Because nothing

in *Caro* indicates that the officer there physically entered the car, it appears that the Tenth Circuit interpreted the Supreme Court's use of the word "enter" as including opening the car door.[7]

Finally, *Caro* explicitly restricts an officer who has no reasonable suspicion from searching for an additional VIN "inside the car." *Id*. at 1247 ("But without further justification than present here, the specific search for an additional VIN inside the car was barred by *Class* and *Miller*. We therefore hold that Trooper Avery's actions exceeded the permissible scope of the detention and violated Mr. Caro's Fourth Amendment rights.").  This further indicates that *Caro* was concerned with accessing the interior of the car, not with whether the officer physically entered the car.

The Tenth Circuit supported this reading of *Caro* in an unpublished opinion issued three years after *Caro*.  In *United States v. Pina-Aboite,* a New Mexico State Police Officer verified by looking through the windshield that an unadulterated dashboard VIN matched that VIN on the registration. *United States v. Pina-Aboite*, 109 Fed.Appx. 227, 230 (10th Cir. 2004) (unpublished).  Nonetheless, the officer opened the driver's side door to view the Nader sticker. *Id.*  The opinion nowhere indicates that the officer physically entered the vehicle.  The Tenth Circuit noted that the officer  "checked the VIN plates on the vehicle against the car's registration two separate times, looking through the windshield to examine the dashboard plate and opening the car door to view the plate on the interior of the driver's side door panel." *Id*. at 234.  It then held that "[t]his procedure contravenes our holding in *Caro* that 'where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause

---

[7] While it appears to me that this is how *Caro* interpreted the word "enter", I agree with later determinations the Tenth Circuit and Judge Browning made that the Supreme Court did not intend "enter" to include opening the car door.

for an officer to extend the scope of a detention by entering a vehicle's passenger compartment for the purpose of further examining any VIN.'" *Id.* at 234 (quoting *Caro*, 248 F.3d at 1246).

In light of *Caro* and *Pina-Aboite*, the landscape in the Tenth Circuit seemed clear: the VIN checking procedure that appears to have occurred in those cases, which is almost identical to that which occurred in the present case, violates the Fourth Amendment.  The government thought so as well.  When the familiar scene again unfolded and came before the Tenth Circuit in 2006, the government conceded the point.  In *United States v. Chavira,* an officer legally stopped a vehicle, checked the VIN on the dashboard and, without asking for permission, opened the driver's side door of the truck and checked the VIN on the doorjamb.  467 F.3d 1286, 1288 (10th Cir. 2006).  The Tenth Circuit noted that "the district court found – and the government does not dispute – that the VIN search violated the Fourth Amendment."  *Id*. at 1289.  Thus, whether the VIN search was illegal was not an issue on appeal.  Instead, the appellate issues were whether a subsequent consent to search the vehicle was valid and, if not, whether the fruits of that search were tainted by the constitutional violation.

Nonetheless, the Tenth Circuit addressed the VIN search issue in a footnote that indicated it would not have found a Fourth Amendment violation had that issue been before it.  That footnote states:

> According to the district court, "[u]nder *United States v. Caro* [248 F.3d 1240 (10th Cir.2001) ], Trooper Phillips impermissibly extended the scope of Chavira's detention by entering his truck to check a secondary VIN against the VIN listed on the registration." R. Doc. 23 at 9. However, *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), makes clear that an officer does not enter the passenger compartment by merely examining the doorjamb VIN plate while standing outside the vehicle. In *Class*, the officer opened the door to see if there was a VIN plate on the doorjamb and, finding none, reached through the open door and moved papers covering the dashboard VIN. The Supreme Court began by noting that (1) the officer could lawfully require the driver to open the door and exit the vehicle and (2) he could lawfully approach the car and view the dashboard through the windshield. Thus, it reasoned, both locations are "ordinarily in plain view of someone outside the automobile," and not subject to a reasonable

expectation of privacy. *Class*, 475 U.S. at 118, 106 S.Ct. 960 (emphasis added). The Court cautioned that "[i]f the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it." Id. at 119, 106 S.Ct. 960. However, the intrusion into the passenger compartment to move the papers was reasonable because the VIN was not in plain view either on the dashboard or the doorjamb. Id. at 118, 106 S.Ct. 960. In *Caro*, we held that "where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention by entering a vehicle's passenger compartment for the purpose of further examining any VIN." 248 F.3d at 1246 (emphasis added). In light of this holding and the Supreme Court's reasoning in *Class*, we believe it is clear that *Caro* applies only when (1) the officer has verified the dashboard or doorjamb VIN from outside the passenger compartment and (2) the officer nevertheless physically enters the passenger compartment to check the VIN. There is no unlawful detention under *Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both.

*Chavira* at 1290 n.1 (10th Cir. 2006).  Given that it appears the officers in *Caro* and *Chavira* did

the same thing—checked the VIN on the inside of a door without actually physically entering the

car—I find the language in this footnote to be in tension with *Caro*.

Nonetheless, I also agree with New Mexico District Court Judge James O. Browning who

recently concluded that this language "rebuked any [] interpretation" from *Caro* that "officers

cannot check both the windshield and the doorjamb VINs."  *United States v. Ramos*, CR 15-3940

JB, ECF. No. 44 at 45 (addressing almost identical actions of the same officer in a separate case).

For the reasons stated in Judge Browning's opinion, I also find that the language in the

*Chavira* footnote is most consistent with the Supreme Court's decision in *Class* and that Officer

Campos's act of opening the car door to check the VIN therefore did not violate the Fourth

Amendment.  *Id.* at 44-49.  I recognize an argument exists that *Caro*, not *Chavira*, controls and

compels a different conclusion because *Caro* came first and the footnote in *Chavira* was dicta.

This argument, however, presumes that *Caro* and *Chavira* are inconsistent. The Tenth Circuit in

*Chavira* clearly believed its footnote to be consistent with *Caro* and so this Court should not find

otherwise.  But even if the Court determines that, under *Caro*, Officer Campos illegally checked

the Nader sticker, I do not recommend suppression of the evidence. This is because, as set forth

below in section C, no causal connection exists between the VIN check and the search that

revealed the illegal drugs.

B.  While Officer Campos's questioning extended past the time constitutionally permissible for a
VIN check, the questioning he conducted during the VIN check was not illegal because it was
otherwise supported by reasonable suspicion

Before addressing the issue of causal connection, however, I must first address

Defendants' argument that, even if Officer Campos's initial act of opening the door did not

violate the Fourth Amendment, the duration of the VIN check did.  Defendants correctly point

out that, even if the Court concludes that Officer Campos could lawfully check the Nader sticker,

he is not allowed to extend Defendants' detention beyond the time reasonably necessary to

conduct this check.  *See Rodriquez v. United States*, 135 S.Ct. at 1615 (officer may not conduct

unrelated inquiries "in a way that prolongs the stop, absent the reasonable suspicion ordinarily

demanded to justify detaining an individual").  The parties agree that it took Officer Campos

approximately five seconds to compare the VIN on the dashboard to the VIN on the registration.

Like the VIN plate on the dashboard, no indication exists that the Nader sticker had been

tampered with or otherwise appeared unusual.  Nothing in the record provides any explanation as

to why it would take significantly longer for Officer Campos to check the Nader sticker than the

dashboard VIN plate.  Officer Campos's dashboard camera, however, reveals that about fifty-

five seconds elapsed from the time Officer Campos opened the door to check the Nader sticker to

the time he closed the door.  It further appears from the video that Officer Campos spent the

majority of this time talking to Defendant Lopez-Lopez.  Based on this evidence, I find that the

duration of Officer Campos's encounter with Defendant Lopez-Lopez while he was checking the

Nader sticker exceeded the time necessary to perform a VIN check.  I also find, however, that

Officer Campos's limited questioning of Defendant Lopez-Lopez during this time was supported by reasonable suspicion that developed during his previous lawful questioning of Defendant Barraza-Rocha.

While writing a traffic citation for Defendant Barraza-Rocha, Officer Campos asked Defendant Barraza-Rocha a number of questions related to the ownership of the vehicle, the occupants in the car, and their travel plans. Video at 7:30 to 11:00.  As long as such questions do not prolong the traffic stop, as these questions did not, they are legal.  During this time, Officer Campos determined that Defendant Barraza-Rocha did not have a valid driver's license (his driver's license was from Mexico) and that although Defendant Barraza-Rocha identified Defendant Lopez-Lopez as being his girlfriend, he did not know her last name.[8] *Id.*

Defendant Barraza-Rocha's inability to provide the last name of his girlfriend, with whom he was traveling over a long distance, provided Officer Campos with sufficient reasonable suspicion to ask Defendant Lopez-Lopez about her travel plans and travel companions.  Officer Campos spent a little less than one minute asking Defendant Lopez-Lopez these questions and, once Defendant Lopez-Lopez provided the last name of Defendant Barraza-Rocha and confirmed that he was her boyfriend, he stopped asking her questions and returned to finish giving a citation to Defendant Barraza-Rocha.  Video at 13:10 to 14:05.  In light of Defendant Barraza-Rocha's inability to provide the last name of his girlfriend, this limited and unobtrusive questioning did not violate the Fourth Amendment.

---

[8] By the time Defendant Barraza-Rocha was providing this information, Officer Aguirre had already arrived and was providing translation between English and Spanish.  Video at 10:00.

C.  Regardless of whether the VIN check was legal, Officer Campos had independent grounds to question Defendant Lopez-Lopez

If the Court rejects my recommendation regarding the legality of the VIN check at its inception, this determination that Officer Campos had reasonable suspicion to ask Defendant Lopez-Lopez questions about her travel plans becomes particularly significant.  This is because "[e]vidence will not be suppressed as fruit of the poisonous tree unless an unlawful search is at least the but-for cause of its discovery." *Chavira*, 467 F.3d at 1291.  During a lawful stop, a police officer  may ask a passenger's name, the name of the driver, about the connection between them, and about their travel plans.  *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001).  Further, for reasons of officer safety, a police officer may ask a passenger to step out of the car. *Maryland v. Wilson*, 519 U.S. 408 (1997).  Conversing with Defendant Lopez-Lopez with the driver's side door open while she is seated in the passenger seat creates even less of an intrusion than having her step out of the car.  Because Officer Campos had independent grounds to speak to Defendant Lopez-Lopez, the legality of his encounter with Defendant Lopez-Lopez does not hinge on the legality of the Nader sticker check.  Defendant Lopez-Lopez fails to meet her burden because she cannot demonstrate that, but for violating the Fourth Amendment by checking the Nader sticker, Officer Campos would not have obtained any information from Defendant Lopez-Lopez.

Both *Caro* and *Chavira* support this conclusion.  In *Caro*, the Tenth Circuit agreed that "suspicious circumstances noted by the government may have justified further questioning of Mr. Caro."  *Caro*, 248 F.3d at 1245.  The problem for the government there, however, was that Mr. Caro was outside the car at the time the officer was performing the VIN check.  Had Mr. Caro been in the car while being questioned and had the officer noticed the air fresheners during this time, the outcome of *Caro* would have been different.

In *Chavira,* the Tenth Circuit determined that the fourteen second doorjamb inspection the government conceded as being unconstitutional "uncovered no contraband, and the second cell phone discovered by the trooper during that time has no demonstrated connection to what occurred next . . . [t]here is no indication that the trooper would not have requested or obtained consent to search the truck but for the inspection of the VIN on the doorjamb. We may not suppress evidence without but-for causation." *Chavira*, 467 F.3d at 1292. Similarly, no but-for causation exists here.

D.  The Detention of Defendant Barraza-Rocha turned into a consensual encounter with Officer Campos

After Officer Campos finished talking to Defendant Lopez-Lopez he gave Defendant Barraza-Rocha a citation, returned his documents, told him he was free to leave, and let him walk back to the car he was driving. A "traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an 'overbearing show of authority.'" *Chavira*, 467 F.3d at 1290. (10th Cir. 2006).  After Officer Campos gave Defendant Barraza-Rocha a citation and returned his travel documents (Hearing Tr. at 17-18) he advised Defendant Barraza-Rocha to be careful getting back on the road and told him that he was free to leave. Video at 16:00.  He further informed Defendant Barraza-Rocha that he was going to let him drive away even though no one in the car had a valid driver's license.  Video at 16:15. Defendant Barraza-Rocha walked back to the car he was driving and, when he reached the car, Officer Campos called out to him and asked him if he would answer some questions. Video at 16:30. The evidence reveals no overbearing show of authority that would prevent a reasonable person in Defendant Barraza-Rocha's position from feeling that he was free to leave.  *See United States v. Sandoval.* 29 F.3d 537, 540-41 (10th Cir. 1994) (explaining that whether traffic stop becomes a

18

consensual encounter depends on whether a reasonable person would feel free to leave, and going over factors relevant to that consideration). To the contrary, the evidence indicates that Defendant Barraza-Rocha believed he was free to leave and that any reasonable person in Defendant Barraza-Rocha's position would have also felt free to leave. Defendant Barraza-Rocha then returned to where Officer Campos was standing and engaged in further discussion with Officer Campos. I find that the initial discussion Officer Campos had with Defendant Barraza-Rocha after returning his documents and telling him that he was free to leave constitutes a consensual encounter.[9]

E. The consensual encounter of Defendant Barraza-Rocha converted back into a detention

After Officer Campos finished asking Defendant Barraza-Rocha questions as part of the consensual encounter, Officer Campos decided that he also wanted to ask Defendant Lopez-Lopez more questions. As a result, he directed Officer Aguirre to tell Defendant Barraza-Rocha to "hang out right here" and Officer Aguirre relayed this instruction to Defendant Barraza-Rocha in Spanish. Video at 21:00. As the government acknowledged during argument, Officer Campos's instruction to Defendant Barraza-Rocha was in the form of an imperative and a reasonable person in Defendant Barraza-Rocha's position would not feel free to ignore Officer

---

[9] Defendant Lopez-Lopez's detention did not likewise become a consensual encounter. Unlike Defendant Barraza-Rocha, Officer Campos never told Defendant Lopez-Lopez that she was free to leave and Defendant Lopez-Lopez was in a car facing away from where Defendant Barraza-Rocha was located when Officer Campos told him he was free to leave. *See Arizona v. Johnson*, 555 U.S. 323, 333-34 (2009) ("Nothing occurred in this case that would have conveyed to Johnson that, prior to the frisk, the traffic stop had ended or that he was otherwise free 'to depart without police permission.'"). Nonetheless, Defendant Lopez-Lopez's continued detention was incidental to Officer Campos's consensual encounter with Defendant Barraza-Rocha and, therefore, not illegal.

Campos's instruction by walking to the car and driving away. Hearing Tr. at 95. Thus, at this

point, both Defendant Barraza-Rocha and Defendant Lopez-Lopez were being detained.

F.  Reasonable suspicion existed to support the second detention of Defendant Barraza-Rocha
and the continued detention of Defendant Lopez-Lopez.

Although I find that Defendants were detained, I agree with the government that

reasonable suspicion existed to support a brief continued detention of Defendant Barraza-Rocha

and Defendant Lopez-Lopez.  During Officer Campos's consensual encounter with Defendant

Barraza-Rocha, Defendant Barraza-Rocha told Officer Campos that they were driving to Denver

to visit a cousin named Alberto. Video at 17:10 to 18:00.  He further advised that, even though

the group planned on staying with his cousin, that he did not know his cousin's address or

telephone number.  Video at 17:50 to 19:00.  He explained that he communicates with his cousin

through Facebook and that his cousin was going to meet him next to the freeway and that they

would then follow his cousin to his house.  Video at 17:50 to 19:00.  Not surprisingly, Officer

Campos found it unusual that Defendant Barraza-Rocha would not have more information about

the cousin with whom he planned to stay.  The suspicions Officer Campos developed during his

conversation with Defendant Barraza-Rocha provided Officer Campos with grounds to further

check out his story with Defendant Lopez-Lopez.

The story did not check out.  From the outset, Defendant Lopez-Lopez provided Officer

Campos with inconsistent information.  Instead of saying that they would be staying with

Defendant Barraza-Rocha's cousin named Alberto, she advised that they were going to meet a

friend of hers from Mexico named Sergio.  Video at 21:45 to 24:20.  Instead of confirming that

they would be staying at someone's house, she told Defendant Lopez-Lopez that they were

planning on staying at a hotel.  She further advised that, even though she had been dating

Defendant Barraza-Rocha for six months, she did not know where he worked.  *Id.* These

20

inconsistent answers provided reasonable suspicion that criminal activity was afoot and justified a brief investigatory detention designed to confirm or dispel that suspicion. *See United States v. Lopez,* 518 F.3d 790, 797 (10th Cir. 2008).

The facts of this case are similar to those in *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001). In *Zubia-Melendez*, an officer lawfully stopped a car; the driver had no valid driver's license; the passenger owned the car; the officer removed the driver from the car; the passenger said he did not know the name of the driver despite his assertion that the driver was his brother-in-law; and the passenger said they stayed at motel the previous night. *Id.* at 1158. The officer then spoke separately with the driver who did not know the passenger's name and said they had stayed in the passenger's home (not a motel) the night before. *Id.* The officer then "issued a warning for the traffic violation and, without telling either man that he was free to go or that they could move from their positions into which he had ordered them, asked both men if he could search the car for drugs." *Id.* at 1158-59. The driver consented and the passenger, who owned the car and did not speak English well, initially said, "No, never" but when immediately asked again replied, "Yeah, no matter." *Id.* at 1159.

In considering whether the officer's continued questioning after issuing a warning for a traffic citation violated the Fourth Amendment, the Tenth Circuit recognized that, once an officer has issued a citation, the driver "must be allowed to proceed on his way, without being subject to further delay by the police if he has produced a valid license and proof that he is entitled to operate the car." *Id.* at 1161 (internal quotations and citations omitted). Nonetheless, "[a]n officer who is presented with the requisite information may nevertheless detain a suspect for further questioning if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring or if the suspect consents to additional questions. *Id.*

(internal quotations and citations omitted).  The court then concluded that "[o]nce Officer Heim received these dubious and inconsistent answers to his questions, he developed reasonable, articulable suspicion that the two men might be engaged in criminal activity, thereby justifying their continued detention for further investigation." *Id*. at 1162.  In so doing, the court noted that "we have held that implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity" and that courts should defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  *Id*. (quotations and citations omitted).

The similarity in facts between the present case and those in *Zubia-Melendez* compel the same ultimate conclusion: the additional questioning of the defendants was supported by reasonable suspicion and did not constitute a Fourth Amendment violation.  This outcome is also consistent with other Tenth Circuit decisions.  *See e.g. United States v. Davis*, 636 F.3d 1281 (10th Cir. 2011) (stating that factors contributing to reasonable suspicion are "an individual's internally inconsistent statements or the inconsistencies between a passenger and driver's statements regarding travel plans."); *United States v. Contreras*, 506 F.3d 1031, 1036 ("We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion"); *United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995) (finding reasonable suspicion justified continued detention because driver's explanation of travel plans were neither plausible nor consistent with the passenger's explanation, and the passenger's responses to questions were internally inconsistent).

G.  Defendant Lopez-Lopez provided valid consent to search the vehicle

I further recommend finding that Defendant Barraza-Rocha and Defendant Lopez-Lopez voluntary consented to the search of the vehicle.[10] Whether voluntary consent was given is a question of fact, determined by the totality the circumstances. *Zubia-Melendez*, 263 F.3d at 1162. The central question in determining whether consent to a search is voluntary is "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request...." *Florida v. Bostick*, 501 U.S. 429, 439, 111 (1991).  While a person's detention at the time of consent is a factor that should be considered, an "individual may voluntarily consent to a search even though he is detained." *Davis*, 636 F.3d at 1293.

In *Contreras*, the Tenth Circuit found that a detained driver's consent to search her vehicle was valid based on the following factors: "(1) Sergeant Bauer's casual phrasing of the request; (2) his tone of voice; (3) his lack of a show of force; (4) his stop in broad daylight on an interstate highway; and (5) Ms. Contreras's repeated responses of "okay" when the officer reiterated his requests for consent." *Contreras,* 506 F.3d at 1037.  The court further noted that "[n]othing in the videotape the testimony at the hearing provides any reason to believe that Ms. Contreras was acting under compulsion." *Id.*

In the present case, Officer Campos casually phrased his request and was polite and professional throughout his encounter with both defendants.  He used a conversational rather than commanding tone of voice and displayed no show of force.  The stop occurred in broad daylight on an interstate highway.  After Defendant Lopez-Lopez first provided consent, Officer

---

[10] Although I find that Defendant Barraza-Rocha's consent was voluntary, I also note that Defendant Lopez-Lopez owned the car and the methamphetamine found in this case was located within the engine compartment.  ECF No. 33 at 10.  Because Defendant Barraza-Rocha had no reasonable expectation of privacy in the location where the methamphetamine was found, as long as Defendant Lopez-Lopez's consent is valid, the validity of Defendant Barraza-Rocha's consent is irrelevant. *Nava-Ramirez*, 210 F.3d 1128 (10th Cir. 2000); *United States v. DeLuca*, 269 F.3d 1128 (10th Cir. 2001).

Campos confirmed that she was consenting to the search.  Further, Officer Campos then provided written consent forms that both Defendant Barraza-Rocha and Defendant Lopez-Lopez filled out confirming their consent.[11]  Prior to providing these forms, Officer Campos asked Defendant Barraza-Rocha and Defendant Lopez-Lopez whether they preferred forms written in Spanish or English and pointed them to the portion of the forms written in the language of their preference.  Further, the recording in this case demonstrates that both defendants understood that Officer Campos was asking them for consent to search the vehicle.

Defendant Barraza-Rocha demonstrated that he understood that he was consenting to a search by inquiring what would happen if the vehicle was damaged during the search.  And, while Defendant Barraza-Rocha expressed concern about damage to the vehicle, nothing in the recording indicates that this concern caused him to revoke his consent or that he was unsatisfied with Officer Aguirre's response that the police would not break anything. Although the recording indicates that Defendant Barraza-Rocha is not fluent in English, it appeared that he understood the questions asked of him in English.  More importantly, however, Officer Aguirre translated Officer Campos's request for consent to search to Defendant Barraza-Rocha in Spanish.

The recording also demonstrates that Defendant Lopez-Lopez, who has lived in the United States since she was seven years old (Hearing Tr. at 149) and attended school in the United States through the ninth grade (Hearing Tr. at 151), had no problem understanding English.  This is consistent with Defendant Barraza-Rocha's earlier representation that Defendant Lopez-Lopez speaks English.  Video at 12:40.  Officer Campos also provided her a consent to search form that she signed.  Video at 32:10.

---

[11] Neither party provided evidence about the content of these consent forms.  As a result, although I consider the act of signing the consent forms to be significant, none of the language that might be on the consent forms can be used to support a finding of voluntariness.

While the video indicates that at least one more officer arrived on the scene to assist with the search once consent had been given, at the time of the search it appears that only Officer Campos and Officer Aguirre were at the scene.  Like Officer Campos, Officer Aguirre displayed no show of force and provided translation to Defendant Barraza-Rocha.  Although Defendant Lopez-Lopez was not free to leave at the time she provided consent, she was sitting in the passenger seat of her vehicle and not restrained in any manner.  Similarly, while the video does not show Defendant Barraza-Rocha, the undisputed testimony was that he was not restrained either.  Hearing Tr. at 19.  Finally, although Defendants had been stopped for approximately thirty minutes at the time they consented to the search, which is slightly longer than an average traffic stop (Hearing Tr. at 18-19), the amount of time they were detained prior to providing consent was not excessive given the need for Officer Campos to follow up on the inconsistent and dubious responses they provided to his questions.  Considering the totality of circumstances, I find Defendant Barraza-Rocha and Defendant Lopez-Lopez provided voluntary consent to search.

H.  Even if Defendant Lopez-Lopez's consent was invalid, Defendant Barraza-Rocha has not demonstrated a factual nexus between the constitutional violation and the evidence found

Defendant Barraza-Rocha's situation is similar to the driver of the vehicle in *Nava-Ramirez* who, as a non-owner of the vehicle, could not establish a factual nexus between his illegal detention and the search of the vehicle.  *Nava-Ramirez*, 210 F.3d 1128 (10th Cir. 2000).  "To successfully suppress evidence as the fruit of an unlawful detention, a defendant must first establish that the detention did violate his Fourth Amendment rights. The defendant then bears the burden of demonstrating a factual nexus between the illegality and the challenged evidence. Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree' . . .."  *Nava-Ramirez*, 210 F.3d at 1131

(internal citations and quotations omitted).  In *Nava-Ramirez*, the Tenth Circuit had already

determined that the search of the trunk where methamphetamine was found violated the owner-

passenger's Fourth Amendment rights because the search was not supported by probable cause.

*Id*. at 1130.  Despite this constitutional violation and the illegal detention of the non-owner

driver, the Tenth Circuit declined to suppress the evidence against the non-owner driver.  As the

court explained, the non-owner driver provided no evidence that, even if he were not illegally

detained, he could have used the car he had been driving to depart the scene. *Id*. 1131.  As a

result, the court concluded that because he "failed to meet his burden of proving a factual nexus

between his detention and the evidence found in the trunk, this court cannot suppress that

evidence as the fruit of the purportedly unlawful detention." *Id*. at 1132.  *See also United States

v. DeLuca*, 269 F.3d 1128 (10th Cir. 2001) (reversing district court's suppression of evidence

because even though the driver and passenger were illegally detained after an initially valid stop

and the driver's consent to search of trunk was involuntary, "the passenger's unlawful detention

was not even a 'but for' cause of the subsequent search, let alone exploitation of that unlawful

detention.").  Because Defendant Lopez-Lopez, not Defendant Barraza-Rocha, had an

expectation of privacy in the engine compartment and Defendant Barraza-Rocha has not

demonstrated that a violation of *his* constitutional rights is causally linked to the discovery of the

methamphetamine, the evidence should not be suppressed as to him—even if the Court rejects

my recommendation and concludes that Defendant Lopez-Lopez's constitutional rights were

violated and the evidence should be suppressed as to her.

III.  <u>CONCLUSION</u>

For the above stated reasons, I recommend that you deny Defendants' joint motion to suppress evidence.


UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**