IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                             No. Crim. 16-455 MCA/SCY

JESUS BARRAZA-ROCHA, and
ARACELI LOPEZ-LOPEZ,

    Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION OF DEFENDANT ARACELI LOPEZ-LOPEZ'S MOTION TO SUPPRESS STATEMENTS (ECF NO. 32)**

Defendant Araceli Lopez-Lopez seeks to suppress statements she made to law enforcement after her arrest on January 12, 2016. ECF No. 32. First, she argues that she did not knowingly and voluntarily waive her right against self-incrimination. *Id*. at 7. Second, she argues that her statements were involuntary and the result of undue coercion. *Id*. at 9. On April 25, 2016, the Court referred this matter to me to conduct hearings and recommend an ultimate disposition. ECF No. 38. After having considered the parties' briefs and arguments as well as evidence provided during a July 25, 2016 hearing on this matter, I conclude that law enforcement's repeated appeals for Defendant to cooperate in an effort to help her children, combined with repeated implications that her children could be taken if she did not, rendered her statements involuntary. Because I recommend that the Court suppress Defendant's post-arrest statements as being involuntarily provided, I do not address Defendant's argument that she did not knowingly and voluntarily waive her right against self-incrimination.[1]

---

[1] In addition, Defendant's briefs and hearing presentation focused on the voluntariness of her statements rather than the voluntariness of her waiver against self-incrimination.

1

I. FACTUAL FINDINGS

At 8:21 a.m. on January 12, 2016, New Mexico State Police ("NMSP") Officer Joshua Campos stopped a car driven by co-defendant Jesus Barraza-Rocha for following too closely. Hearing Tr. at 6.[2] Defendants do not contest that this stop was legal and based on probable cause. Hearing Tr. at 30. Although co-defendant Barraza-Rocha was driving the vehicle at the time of the stop, one of the passengers, Defendant Araceli Lopez-Lopez, owned the car. Hearing Tr. at 21; ECF No. 22 at 2. When questioned about their travel plans, Defendants provided inconsistent answers that made Officer Campos suspicious and caused him to separately ask Defendants for consent to search the vehicle. Both Defendants consented to the search. After Defendant Lopez-Lopez ("Defendant") consented to the search, Officer Campos privately advised Officer Aguirre of his intent to tell Defendant that he knows she has two kids and that this is her chance to help herself out. Video at 33:15 to 35:30. Officer Campos then returned to Defendant Lopez-Lopez, told her she needed to think about her kids and that she needed to be honest with him. Video at 36:30 to 37:00. He noted that if there was something she was not part of and there was some type of contraband in the vehicle that he did not want her to be separated from her kids. *Id*. Thus, he told her, this was her time to help herself and him because if he searches the car, finds something, and she was not honest with him, then "we are going to go from there, so." Video at 36:30 to 37:00. Defendant reaffirmed that there was nothing in her vehicle. Video at 37:00.

---

[2] I cite to the transcript of the July 25, 2016 hearing as "Hearing Tr.", the government's transcript of Officer Moya's January 12, 2016 interview as ECF No. 37-1, the audio recording of this interview as "Interview Audio" and the audio and video recording of Officer Campos's stop of Defendants as "Video". With regard to the video of the stop and the audio of the interview, I will cite to elapsed time. The video recording of the stop, audio recording of the interview, and transcript of the interview were all admitted into evidence at the July 25, 2016 suppression hearing.

Officer Aguirre and Officer Campos then began to search Defendant's vehicle. As a product of the search, the officers eventually discovered methamphetamine hidden within the engine block. Hearing Tr. at 53.[3] During the subsequent drive to the New Mexico State Police ("NMSP") Office, after Defendant brought up the subject of her children by mentioning that she works for them, Officer Campos told her that she has to think about her kids and that what is most important now is her family and what is going to happen to them. Video at 1:49:40 to 1:50:30.

Once Defendant arrived at the police station, law enforcement placed her in a room with her children. Hearing Tr. at 144-45. When NMSP Officer Eric Moya arrived to question Defendant, another officer, with Defendant's consent, removed the children from the interview room. Audio Tr. at 8. During this interview, Officer Moya made several references to Defendant's children (as set forth more fully below) and Defendant eventually made inculpatory statements.

Defendant's interaction with law enforcement was recorded. A dashboard camera and an audio recorder were used to record Officer Campos's interaction with Defendant from the time of the traffic stop through the time she was transported to the NMSP office in Albuquerque. Officer Moya also made an audio recording of his interview of Defendant. In its Response to Defendant's Motion to Suppress Statements (ECF No. 37), the United States provided a transcript of the interview, with Spanish portions translated into English. ECF No. 37-1.[4] Except for one small portion of this transcript, the recorded portions of Defendant's interactions with

---

[3] The government did not present evidence as to whether Officer Campos gave Defendant *Miranda* warnings.
[4] When referring to page numbers on this transcript, I will use the docketing number on the top of the page rather than the number at the bottom of the page.

law enforcement, including the transcript the United States provided, are not in dispute.[5] Hearing Tr. at 161.

With regard to the portion of the interview about which the parties disagree, the parties have submitted transcripts with competing translations. Because those competing transcripts have been filed, I will not recite them here. *See* ECF No. 37-1 at 14; *see also* ECF No. 56 (setting forth credentials of government's interpreter); ECF No. 58 (Defendant's proposed transcript). Further, I find the differences in the competing transcripts to be insignificant. Because my recommendation is to suppress Defendant's statements regardless of which transcript is used, my analysis gives the government the benefit of the doubt and uses the transcript they provided.

II. ANALYSIS

Defendant argues that Officer Campos's and Officer Moya's repeated references to her children were coercive and made her statements involuntary. ECF No. 32 at 9-12. In a due process voluntariness analysis, courts must decide "whether the confession is the product of an essentially free and unconstrained choice by its maker. If so, it may be used against him. If instead his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *United States v. Rodebaugh*, 798 F.3d 1281, 1290 (10th Cir. 2015) (quotations and citations omitted); *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (an inculpatory statement, to be admissible, must be made voluntarily and of the defendant's free will). The Tenth Circuit has held that "[a] statement is involuntary in violation of due process if 'a defendant's will was overborne by the circumstances surrounding' his confession." *United States v. Lamy*, 521 F.3d 1257, 1261 (10th Cir. 2008) (*quoting Dickerson v.*

---

[5] As noted at the hearing in this matter, the transcript of Defendant's interview with Officer Moya does contain typographical errors. Hearing Tr. at 139-40. Except for the portion of the interview that is transcribed as the paragraph on ECF No. 37-1 at 14, however, no dispute exists regarding the meaning of the Video or ECF No. 37-1.

*United States*, 530 U.S. 428, 434 (2000).  Thus, a court must consider the totality of the circumstances and the "[r]elevant circumstances embrace both the characteristics of the accused and the details of the interrogation." *United States v. Lopez,* 437 F.3d 1059, 1063 (10th Cir. 2006) (quotations omitted). "Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *Id.* at 1063–64. "The Supreme Court has held coercive police activity to be a necessary predicate to the finding that a confession is not voluntary." *Smith v. Mullin,* 379 F.3d 919, 934 (10th Cir.2004) (quotations omitted).

In support of her argument, Defendant primarily relies on the Supreme Court's decision in *Lynumn v. State of Illinois*, 372 U.S. 528 (1963).  The defendant in *Lynumn* sought to suppress evidence of her confession that she had sold marijuana to a man named Zeno.  *Id*. at 530-31. Specifically, the defendant argued that, after she repeatedly denied selling the marijuana to Zeno, the interviewing officer "started telling me I could get 10 years and the children could be taken away and strangers would have them, and if I could cooperate he would see they weren't . . . and I had better do what they told me if I wanted to see my kids again." *Id*. at 531.  The defendant further testified that "[a]fter that conversation I believed that if I cooperated with them and answered the questions the way they wanted me to answer, I believed that I would not be prosecuted.  They had said I had better say what they wanted me to, or I would lose the kids.  I said I would say anything they wanted me to say." *Id*.  The police officers did not deny that these were the circumstances under which the defendant confessed she had sold marijuana and the Supreme Court determined that "their testimony largely corroborated the petitioner's testimony." *Id*. at 532.  The Supreme Court ultimately determined that it "is thus abundantly clear that the

5

petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" *Id*. at 534.  Under these circumstances, the Supreme Court determined the confession "must be deemed not voluntary, but coerced." *Id*.  Thus, the Supreme Court has made clear that when law enforcement secures a confession after telling a defendant that she will lose her children if she does not cooperate, the confession must be suppressed.

As Defendant points out in her reply brief (ECF No. 46 at 3-4), at least one federal circuit court of appeals has extended *Lynumn* beyond scenarios in which officers explicitly tell a defendant that she will lose her children unless she cooperates. In *United States v. Tingle*, after the defendant signed a form waiving her right to remain silent, an FBI agent accused the defendant of lying, told the defendant what he thought happened, advised her that there were advantages to cooperating, and listed the statutory maximum penalties associated with crimes for which she could be charged. *United States v. Tingle*, 658 F.2d 1332, 1333-34 (9th Cir. 1981). After the defendant repeatedly maintained her innocence, the agent "told her either that she would not see the child for a while if she went to prison or that she might not see the child for a while if she went to prison." *Id*. at 1334.  After sobbing for several minutes, the defendant then confessed. *Id*.

> Under these facts, the Ninth Circuit stated
>
> We think it clear that the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time. We think it equally clear that such would be the conclusion which Tingle could reasonably be expected to draw from the agent's use of this technique. The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation," they exert the "improper influence" proscribed by *Malloy*. The warnings that a lengthy prison term could be imposed, that Tingle had a lot at stake, that her cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might not

>see her two-year-old child for a while must be read together, as they were intended to be, and as they would reasonably be understood. Viewed in that light, Sibley's statements were patently coercive.

*Tingle* at 1336 (footnotes omitted).  Regarding the agent's comment about the children, the court found that it "need not decide whether the statements served the identical purpose as the *Lynumn* statements, i.e., caused the mother to believe she would lose permanent custody of her offspring, although we note that such is certainly a possible effect of the statements made here. We base our holding that the confession was involuntary on the assumption that the statements caused Tingle to fear only that she would not see her child for a substantial period of time." *Tingle* at 1336.

In the present case, as in *Tingle*, law enforcement deliberately appealed to Defendant's maternal instincts to inculcate fear that a refusal to cooperate would negatively impact her ability to see her children for a substantial period of time.  This process began when Officer Campos, in an aside with hushed voice, told Officer Aguirre that when he speaks to Defendant he is going to tell her that he knows she has two kids and this is her chance to help herself out.  Video at 33:15 to 35:30.  True to his word, Officer Campos then told Defendant that she needs to think about her kids, that she needs to be honest with him, that he knows she has two kids and that he did not want her to be separated from her kids if there was some type of contraband in the vehicle.  Officer Campos further stated that this was her time to help herself and to help him out because if he searches the car and there is something in there and she was not honest with him then "we are going to go from there, so…." Video at 36:30 to 37:00.  This section of the video makes clear that Officer Campos's intent in bringing up Defendant's children was to communicate to her that her decision to cooperate will impact whether she would be separated from her children.

After Defendant was arrested, as Officer Campos and Defendant were driving to the NMSP Office and after Defendant brings up the subject of her children, Officer Campos advised

7

Defendant that she needed to think about her kids and that what is most important now is her family and what is going to happen to them. Video at 1:49:40 to 1:50:30. When Officer Moya arrived at the police station to question Defendant, he continued on this theme by repeatedly bringing up Defendant's children.

At the inception of his interview, just after he introduces himself as an agent with the state police, Officer Moya told Defendant "Look, Araceli, I know your family is very important to you, okay? These are your two kids, right? They are not Jesus', right? Okay. So . . . Look Araceli, it's, it's . . . It's very important that you help yourself for them, okay? You guys are in deep stuff. All right? . . . I don't have to tell you that you're in a very, very, bad place. Especially you because you have a lot . . . on your shoulders because of them. Do you understand? They couldn't care less because they . . . Your kids don't care less, okay? Especially Jesus. But right now we're going to see who . . . who is going to, who is going to tell the truth. Do you understand? But that's why I wanted to talk to you first. Because I think you have more to lose than they do." ECF No. 37-1 at 6-7. Defendant then responded, "Yes." *Id*. Officer Moya asked her, "Do you understand", to which Defendant replied, "My kids", and Officer Moya confirmed, "Exactly". *Id*. This exchange indicates that Defendant reasonably understood Officer Moya to be telling her that what she stands to lose is her children and that she stands to lose them by not being the first to cooperate—a belief Officer Moya confirmed when he said "Exactly".

Officer Moya next advised Defendant that law enforcement has to report all of this because there are children involved, "But the thing is that . . . I can't tell you how important it is for you to tell me the truth so you can help yourself for your kids, okay." *Id*. at 7. Up to this

point, there was no indication that Defendant had been given her *Miranda* rights.[6] Thus, even before Officer Moya presented Defendant with waiver of rights forms, he impressed upon her the gravity of her situation and that she could help her kids by cooperating.

Next, after a short discussion about Defendant's work, Officer Moya told Defendant that he wanted her to tell him the truth and that "I don't want you to be lying to me because look, later on I'm not going to care. I, I go home today and you go to jail. Your, your kids will be taken away." *Id*. at 10. When Defendant replied, "No, I don't want that", Officer Moya advised Defendant that he was not telling her that to scare her, he was just telling her so that she will know. *Id*. Here, Officer Moya chose not to immediately capitalize on the opportunity to imply that it would be less likely that her kids would be taken away from her if she cooperated. Instead, he made clear that he was simply advising her about what was going to happen. In isolation, I do not find it troubling that an officer would advise a defendant who has been arrested in the presence of her children about what is going to happen to the children. To the contrary, I would find it troubling if an officer did not provide a defendant with such information. Nonetheless, this portion of the transcript demonstrates that Officer Moya's initial comments had their intended effect of making Defendant concerned about losing her children.

Moreover, Officer Moya's next statements indicate that he was doing more than just telling Defendant about what was going to happen with her kids. He says, "[i]f you were a police officer and I was not doing well by my children and I had them stealing . . . you would, you would do the same thing. Because they are little. They don't know what's happening right now, okay? They are innocent." *Id*. at 11-12. The last three sentences in this passage, in which Officer Moya talks about Defendant's children being little and innocent do not logically flow

---

[6] It is possible that Officer Campos or Officer Aguirre gave Defendant her *Miranda* warnings when they arrested her on the side of the highway. The United States, however, has not alleged that they did so and I have not scoured the nearly two hour Video in search of such warnings.

from his first sentence about what Defendant would do if she were a police officer. This indicates that Officer Moya's purpose in mentioning that Defendant's children are little and innocent is to again appeal to her maternal instincts.

Officer Moya next had Defendant read the waiver of rights form he provided her. Once Defendant signed this form, Officer Moya again connected his desire to have Defendant tell him about the drugs in the car with the welfare of her children. According to the government's transcript, Officer Moya told her, "Look Araceli, like I told you, I don't know what's going on but that's why I'm here wanting to know what . . . what's going on, right? Because I don't know you and you don't know me and that's the way things happen, right? But I don't . . . want your kids to be taken, okay? So, what . . .? First of all what I came and showed you is a lot of drugs. Okay? You don't just uh, trust people from the street . . Well, yes, the, the . . . the amount of drugs that you have. Okay? You had to have picked that up or what? I want you to tell me from the start. From when you went to Phoenix and picked up to where you were going."[7] In this paragraph, by stating "I don't want your kids to be taken, okay" just before requesting Defendant to tell him about picking up the drugs in Phoenix and where they were going from there, Officer Moya conveys to Defendant that providing this information to him will affect whether or not her kids are taken away. This statement implying that whether her kids will be taken might be dependent on the outcome of her decision to cooperate is particularly troubling because it follows multiple comments about how Defendant could help her children by cooperating.

When Defendant told Officer Moya only that they left Phoenix, "came here and that's when . . . when the police stopped us," Officer Moya then sighed, cleared his throat, and told her "there is a lot that happened before that, okay." *Id*. at 14. He then told her that she was not being

---

[7] Although the parties disagree about what Officer Moya said in this paragraph and submitted different translations of this paragraph, I do not find those differences to be material. Under either version, I would ultimately conclude that the questioning of Defendant was unconstitutionally coercive.

10

honest with him and when Defendant told him, "I don't know where he . . . got it from", Officer Moya again returned to the subject of her children. He told her "I'm trying to, to give you the opportunity to tell me the truth because I know you have two children." Officer Moya did not explain what her telling him the truth has to do with her children but, through a subsequent unfinished sentence, he implied that not telling him how the drugs got into the car and where the drugs were headed would have consequences related to her children. Specifically, immediately after telling her to be truthful because of her children he said, "But if you don't tell me the story and you tell me, 'Look, this is where they went. They picked all of this up and I knew but didn't want to go. I didn't want to be part of this but they forced me,' or something. Understand?" Although Officer Moya did not articulate the consequence of the conditional that begins "if you don't tell me", the most reasonable conclusion for Defendant to draw in the context of her questioning and the repeated references to her children is that the consequences will involve her children. This line of questioning immediately led to the turning point of the interview: Defendant responds, "they didn't force me" and that "it was a stupidity" followed by other inculpatory statements. *Id*. at 14-15. In sum, while no officer makes a statement containing the same type of explicit quid pro quo as that present in *Lynumn*, the timing of Officer Campos's and Officer Moya's statements regarding Defendant's children and the implications inherent in their statements are designed to appeal to Defendant's maternal instincts and, more importantly, to convey to her that her decision about cooperating will impact her ability to see her children.

In arguing that this questioning is not coercive, the government first asserts that Officer Moya's statements about Defendant's children are permissible psychological appeals to her conscience that "consist[] almost entirely of reminders of the importance of telling the truth in this situation." ECF No. 37 at 5. I disagree. Officer Moya's statements went beyond

"permissible psychological appeals to [her] conscience" that "although possibly making [her] emotional during the interview, do not demonstrate that [her] will was overborn." *Ortiz v. Uribe*, 671 F.3d 863, 872 (9th Cir. 2011).[8] In *Ortiz*, "Detective Cardwell simply reminded Ortiz of his obligation to his family to tell the truth and that his children were counting on him to do the right thing." *Id*. Rather than simply referring to Defendant's children as an appeal to her conscience, law enforcement conveyed to Defendant that not cooperating would negatively impact her children, including possibly having them taken away. Placing Defendant's children on one side of a strongly implied quid pro quo makes the facts of this case more egregious than those in *Ortiz*.[9]

The government next argues that "Officer Moya's questions are well within [the] bounds" set by other cases in which law enforcement used "even deceptive tactics when interviewing suspects." ECF No. 37 at 6. It is true that, without violating the constitution, officers have obtained confessions by lying about statements a co-conspirator has made, lying about having fingerprints or other evidence inculpating a defendant, and lying about their purpose for wanting to speak to a defendant. *Id*. (citing cases); *see also Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) (citing similar instances). As the Seventh Circuit has pointed out, however, these interview techniques do not employ the same "brand of police trickery the Supreme Court considered inherently coercive in *Lynumn v. Illinois* . . .." *Holland*, 963 F.2d at 1051. The government's examples of lies police have constitutionally used to obtain

---

[8] The government attributes this quote to *United States v. Goldtooth*, 111 F.Supp.3d 1020, 1024 (D. Ariz. 2015). ECF No. 37 at 5. The Court in *Goldtooth*, however, was quoting *Ortiz* and so I will look at the facts underlying *Ortiz* rather than those underlying *Goldtooth*.

[9] The repeated references to Defendant's children and the clear implication that not cooperating will have consequences related to Defendant's children also make the facts of the present case more egregious than those present in *Tingle*. However, because I think *Tingle's* expansion of *Lynumn* went too far, I do not recommend finding *Tingle* to be determinative of the law in the Tenth Circuit. Defendant fails to cite cases outside of the Ninth Circuit where facts similar to those in *Tingle* resulted in the suppression of evidence.

<a>
</a>

a confession "affect the suspect's beliefs regarding her actual guilt or innocence, and judgments regarding the evidence connecting her to the crime." *Id*. at 1051-52.  They do not, however, "distort[] the suspect's rational choice (*i.e.,* is it wise or morally right to confess given the aforementioned beliefs and judgments?) by introducing a completely extrinsic consideration: an empty but plausible threat to take away something to which she and her children would otherwise be entitled." *Id*. at 1052.  This "extrinsic consideration not only impair[s] free choice, but also cast[s] doubt upon the reliability of the resulting confession, for one can easily imagine that a concerned parent, even if actually innocent, would confess and risk prison to avoid losing custody of her children and their welfare benefits." *Id*.  For the same reasons articulated by the Seventh Circuit, I reject the government's invitation to define the scope of *Lynumn* through reference to the non-analogous cases the government cites.

Furthermore, other factors that tend to demonstrate coercion are that Defendant was alone and detained at the time of her interview (Audio Tr. at 8-9), had only a ninth grade education (Hearing Tr. at 151), did not have any apparent familiarity with the criminal justice system and was emotional and concerned about her kids prior to and during questioning (Video at 1:49:30 – 1:50:00, Interview at 5:30 forward).  Also significant are law enforcement's repeated warnings to Defendant regarding the gravity of her situation, the fact that the turning point in the interview occurred just after Officer Moya implied that not cooperating could have consequences with regard to her children, and the fact that this implication occurred just after Defendant provided a non-inclupatory statement. Transcript at 14-15.  On the other hand, weighing against a coercive environment is that the questioning was short and occurred not long after Defendant's arrest.  Further, law enforcement never used an excessive show of force. Instead, law enforcement acted in a calm, professional, and polite manner, making sure Defendant was comfortable before and

during questioning.[10] *See Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015) (setting forth non-exhaustive list of factors to consider). Although Officer Moya made references to Defendant's children and the need to cooperate for their benefit prior to advising her of her rights, Officer Moya did advise Defendant of her *Miranda* rights and Defendant did waive these rights before she made any inculpatory statements. Audio Tr. at 7-12. Absent references to Defendant's children, the totality of the circumstances indicate that the atmosphere surrounding Defendant's statement was not coercive.

Law enforcement's implicit communication that Defendant's failure to cooperate might cause her children to be taken away, however, changes the equation. Defendant testified that the only reason she started talking to Defendant Moya was "[f]or my children, because I didn't want my children to be taken away." Hearing Tr. at 158. Given the numerous comments law enforcement made to her about her children, it was reasonable for her to harbor this belief. As a result, I conclude that Defendant's statements were not the product of an essentially free and unconstrained choice.

III. CONCLUSION

For the above stated reasons, I recommend that you grant Defendant's motion to suppress her post-arrest statements.

_____
UNITED STATES MAGISTRATE JUDGE

---

[10] Defendant testified that between the time of Officer Campos's recording and Officer Moya's recording, law enforcement engaged in non-professional conduct toward her. (Hearing Tr. at 156-57). My analysis does not credit these allegations.

14

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**